**KUZYK LAW, LLP**
Michael D. Braun (SBN 167416)
*mdb@kuzykclassactions.com*
1999 Avenue of the Stars, Ste. 1100
Los Angeles, CA 90067
Telephone: (213) 401-4100
Facsimile: (213) 401-0311

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **EDISON CORPUZ on behalf of himself and all others similarly situated,** | **CASE NO.:**   '22CV0901 RBM AHG |
| | **CLASS ACTION** |
| **Plaintiff,** | **COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |
| **v.** | |
| **WALMART, INC.** | **DEMAND FOR JURY TRIAL** |
| **Defendant.** | |

Plaintiff Edison Corpuz ("Plaintiff"), on behalf of himself and all others similarly situated, brings this class action against Walmart Inc. ("Walmart"), and on the basis of personal knowledge, information and belief, and the investigation of counsel, alleges as follows:

## INTRODUCTION

1. This is a proposed class action on behalf of a nationwide and California class of consumers seeking redress for Defendant's deceptive practices associated with the advertising, labeling and sale of its Spring Valley 1000 mg Fish Oil dietary supplement ("Product" or "Supplement").

2. Fish is a major source of healthful long-chain omega-3 fats and are rich in other nutrients such as vitamin D and selenium, high in protein, and low in saturated fat. Numerous studies have shown that consuming fatty fish 2-3 times a week reduces the risk of heart disease and stroke, as well as provides a myriad of additional health benefits. Scientific consensus is that consuming fatty fish as part of the diet materially contributes to good health.

3. Unfortunately, most Americans do not, or cannot, consume fatty fish with such regularity and have instead turned to the consumption of fish oil.

4. Indeed, as of 2012, fish oil supplements had become the most commonly used non-vitamin, non-mineral dietary supplement sold in the U.S., and to this day remain one of the most popular dietary supplement offerings. By 2019, the global fish oil market was valued at $1.9 billion, and is currently estimated to reach $2.8 billion by 2027. It remains a lucrative business with numerous market participants vying for consumer attention and their spending dollars.

5. Defendant markets, labels and sells a Product prominently described as "Fish Oil" consisting of consisting of 600 mg of Eicosapentaenoic Acid ("EPA") and 400 mg of Docosahexaenoic Acid ("DHA") – the essential omega-3 fatty acids that naturally occur in fish.

**Principal Display Panel**          **Supplement Fact Panel**




6.    The Product's principal display panel ("PDP") quantifies the Product as 1,000 mg of fish oil consisting of 600 mg of EPA and 400 mg of DHA. The supplement facts panel ("SFP") reaffirms that the Product contains 1,000 mg of fish oil and then claims to provide 1060 mg of Omega-3 Fatty Acids as Triglycerides including Eicosapentaenoic Acid as EE and Docosahexaenoic Acid as EE.

7.    Contrary to what is represented on both the front and back of its label, this Product is not Fish Oil, nor does it contain a single milligram of the principal Omega-3s found in fish oil (i.e., EPA and DHA). Rather, Defendant's Product is a lab synthesized solution – the result of a chemical process known as trans-esterification,

whereby an industrial solvent and ethanol are used to molecularly alter and substantially transform otherwise unmarketable **fish waste** into a consumable product.

8.     Critically, the process eliminates the majority of fish oil's constituent ingredients and substantially transforms its Omega-3s (i.e., DHA and EPA) into fatty acid ethyl esters – a substance that is materially distinct from the fish oil reasonably expected by consumers and which does not otherwise exist in nature

9.     In addition to misleadingly claiming that this Product is simply "fish oil," the label suffers from numerous other inaccuracies that renders it holistically deceptive and misleading.

10.     First, notwithstanding the fact that the Product does not contain a scintilla of EPA and DHA (i.e., as it contains EPA Ethyl Esters and DHA Ethyl Esters), it also does not contain the claimed amount of Omega-3 in any form. Plaintiff's analytical tests demonstrate that the 1,000 mg capsules contain approximately only ½ of the amount of Omega-3s Walmart claims to provide consumers (i.e., 300 mg EPA-EE and 200 mg DHA-EE instead of what the label promises – 600 mg EPA and 300 mg DHA).

11.     Second, the Supplement Facts Panel states the Product contains "1060 mg of Omega-3 Fatty Acids as Triglycerides." This is incorrect on two counts. First, it is mathematically impossible for 1,000 mg of fish oil to consist of 1,060 mg of Omega-3 Fatty Acids ("OM3"), or anything else. Second, analytical tests definitively demonstrate this Product is a pure ethyl ester and therefore completely devoid of Triglycerides.

12.     Despite claiming that the OM3 content is in triglyceride form, after the scientific names for EPA and DHA Walmart indicates the OM3s to be "as EE." As a preliminary matter, nowhere on the label does Walmart define what it means by the abbreviation "EE," leaving a consumer to guess. Moreover, even if the term "EE" were to be interpreted to mean "ethyl ester," the label now makes conflicting claims

(i.e., the OM3 content cannot be both a triglyceride and ethyl ester) rendering an already misleading label, terminally deceptive.

13. At bottom, the most material representation on a dietary supplement label is the product's name – the fundamental indicia of its contents. Once trans-esterified, fish oil is irrevocably transformed, such that it is no longer fish oil and therefore cannot be so named or labeled. In addition to this deception, the label is fraught with numerous qualitative and quantitative representations regarding the characteristics of its Products which renders it misleading, deceptive and unlawful.

14. As alleged herein, Defendant's conduct is in breach of warranty, violates California's Business and Professions Code § 17200, *et. seq.,* California's Business & Professions Code § l7500, *et. seq.,* California Civil Code § 1750, *et seq*., and is otherwise grounds for restitution on the basis of quasi-contract/unjust enrichment.

15. Throughout the applicable class periods, Defendant falsely represented the fundamental nature of its Product, and as a result of this false and misleading labeling, was able to sell this Product to tens of thousands of unsuspecting consumers throughout California and the United States.

## JURISDICTION AND VENUE

16. Jurisdiction of this Court is proper under 28 U.S.C. § 1332(d)(2). Diversity jurisdiction exists as Plaintiff Corpuz is a resident of Oceanside, California and Defendant Walmart is Delaware corporation which maintains its principal place of business in Bentonville, Arkansas. The amount in controversy exceeds $5,000,000 for the Plaintiff and members of the Class collectively, exclusive of interest and costs, by virtue of the combined purchase prices paid by Plaintiff and members of the putative Class, and the profits reaped by Defendants from their transactions with Plaintiff and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the injunctive and equitable relief sought.

17. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the underlying transactions and events complained of

occurred and affected persons and entities located in this judicial district. Defendant has received substantial compensation affected transactions and business activity in this judicial district.

## **PARTIES**

18.     Plaintiff Edison Corpuz is a resident of Oceanside, California.

19.     Mr. Corpuz purchased Walmart's Spring Valley 1,000 mg Fish Oil on several occasions over the past 3 years, including most recently in or around December 2021 from Defendant Walmart.

20.     Mr. Corpuz made each of his purchases after reading and relying on Defendant's Product label.

21.     Mr. Corpuz believed the representations on the Product's label that, among other things, it was actual fish oil containing 400 mg of DHA and 600 mg of EPA and contained such amounts as advertised.

22.     Mr. Corpuz believed that Defendant Walmart lawfully marketed and sold the Product.

23.     Mr. Corpuz relied on Defendant's labeling and was misled thereby.

24.     Mr. Corpuz would not have purchased the Product, or would have purchased the Product on different terms, had he known the truth.

25.     Mr. Corpuz was injured in fact and lost money as a result of Defendant's improper conduct.

26.     If Mr. Corpuz has occasion to believe that Defendant's marketing and labeling is truthful, non-misleading, and lawful, he would consider purchasing the Product in the future.

27.     Plaintiff Corpuz and members of the Class have been economically damaged by their purchase of the Products because the advertising for the Products was and deceptive and/or misleading under California law and the Products are misbranded; therefore, the Products are worth less than what Plaintiff and members of

the Class paid for them and/or Plaintiff and members of the Class did not receive what they reasonably intended to receive.

28.     Defendant Walmart is incorporated in Delaware and headquartered in Bentonville, Arkansas. Walmart is one of America's largest retail corporations operating chains of supercenters, department and grocery stores across the United States, including more than 300 of which are located in California.[1] Walmart manufactures and sells dietary supplements under the trademarked name Spring Valley.[2]

## GENERAL ALLEGATIONS

### A.     OMEGA-3 FATTY ACIDS

29.     Omega-3 Fatty Acids ("Omega-3" or "OM3") are polyunsaturated carboxylic acids that provide numerous health benefits to the human body including a variety of critical organs and systems (e.g., heart, brain, eyes, blood vessels, lungs, immune, endocrine, and reproductive systems).[3]

---

[1] https://www.statista.com/statistics/1167169/walmart-number-of-stores-by-state-us/

[2] https://trademark.trademarkia.com/spring-valley-75334681.html.

[3] *Omega-3 Fatty Acids*, National Institutes of Health, Office of Dietary Supplements, available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-Consumer; H. Breivik, *Long-chain Omega-3 Specialty Oils*, Woodhead Publishing in Food Science, Technology and Nutrition at 11 (hereinafter "Breivik at ___")(Clinical research has suggested that Omega-3s help prevent cardiovascular disease, Alzheimer's, dementia, macular degeneration, and rheumatoid arthritis. There is also support that Omega-3s provide benefits for sufferers of arthritis, Crohn's disease and patients with neuropsychiatric disorders such as depression and schizophrenia).

30.     Among the 11 types of OM3s, the three most important to human physiology are alpha-linolenic acid ("ALA"), docosahexaenoic acid ("DHA") and eicosapentaenoic acid ("EPA").[4]

31.     The primary source of EPA and DHA are marine oils from fatty fish and other seafoods.

32.     Although experts have not established a daily recommended amount for DHA and EPA, the National Institutes of Health, Office of Dietary Supplements ("NIH") acknowledges that eating fatty fish rich in DHA and EPA has beneficial effects with respect to a variety of health conditions such as cardiovascular disease, age-related macular degeneration, Alzheimer's disease, dementia, dwindling cognitive function, rheumatoid arthritis, high blood pressure, and certain cancers.[5]

33.     Indeed, between 2017 and 2019, the American Heart Association ("AHA") released three science advisories related to Omega-3s, all of which recommend adults consume one to two servings of seafood per week to reduce the risk of congestive heart failure, coronary artery disease, stroke, and sudden cardiac death.[6]

---

[4] ALA Omega-3 fatty acids are primarily found in plant oils and generally used by the human body for energy. To be used for something other than energy, ALA must first be converted into EPA or DHA. Unfortunately, this conversion process is inefficient and results in only a small percentage of ALA being converted into EPA and DHA.

[5] Available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-Consumer/

[6] Etherton, P., et al, *Omega-3 Fatty Acids and Cardiovascular Disease New Recommendations From the American Heart Association*, AHA Arteriosclerosis, Thrombosis, and Vascular Biology Journal (2003) available at https://www.ahajournals.org/doi/full/10.1161/01.ATV.0000057393.97337.AE; *See also*, National Institutes of Health, *Omega-3 Fatty Acids*, available

---

34.     In 2019 the U.S. Food and Drug Administration ("FDA") approved five qualified health claims relating to the consumption of the EPA/DHA and its effect on heart health.[7]

35.     Unfortunately, Americans generally do not consume a sufficient amount of fatty fish necessary to maintain adequate levels of EPA and DHA. In response to this deficiency, health care professionals began recommending that Americans supplement their diets with fish oil.[8]

36.     In 1995, fish oil supplements generated only $35 million in annual sales. By 2005, that number had increased to $310 million and by 2012, fish oil supplements had become the non-vitamin/non-mineral natural product most commonly taken by both adults and children with approximately 7.8 percent of adults (18.8 million) and 1.1 percent of children age 4 to 17 (664,000) regularly consuming fish oil

---

at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-HealthProfessional/#:~:text=For%20people%20with%20existing%20coronary,of%20a%20physician%20%5B80%5D.

[7] *FDA Announces New Qualified Health Claims for EPA and DHA Omega-3 Consumption and the Risk of Hypertension and Coronary Heart Disease*, June 19, 2019, available at https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-new-qualified-health-claims-epa-and-dha-omega-3-consumption-and-risk-hypertension-and.

[8] Mackay, *A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride Form*, available from http://www.promedics.ca/site/downloads/Triglycerides%20vs%20Ethyl%20Esters.pdf

supplements.[9]  By 2019, the global fish oil market had grown to $1.9 billion, and is currently estimated to reach $2.8 billion by 2027.[10]

**B.    FISH OIL**

37.    Omega-3 fatty acids, including EPA and DHA, are found in a variety of fatty fish such menhaden, sardines, anchovies, salmon and tuna. The oil from these fish is extracted by a fairly straightforward process which has been employed in a similar fashion since the early 1800s whereby fish are caught, cooked and pressed.[11]

38.    Today, the process remains relatively the same. Once fish are caught, they are on-boarded to a fishing vessel and quickly boiled. The fish are then pressed, separating the water and oil from proteins and solids. Thereafter, the water is separated from the oil. The oil undergoes a polishing process (i.e., deacidifying, degumming, and washing the oil several times). It is subsequently bleached and deodorized.  The resulting oil is ultimately encapsulated and sold as supplements. The diagram below represents the most common method for processing fish oil.[12]

---

[9]  NIH, *Omega-3 Supplements: In Depth*, National Center for Complementary and Integrative Health,  available at https://www.nccih.nih.gov/health/omega3-supplements-in-depth#:~:text=Use%20of%20Omega%2D3%20Supplements%20in%20the%20United%20States&text=The%20survey%20findings%20indicated%20that,in%20the%20previous%2030%20days.

[10]  Global Fish Oil Market (2020 to 2027) - Opportunity Analysis and Industry Forecast - ResearchAndMarkets.com, Business Wire, available at https://www.businesswire.com/news/home/20200909005847/en/Global-Fish-Oil-Market-2020-to-2027---Opportunity-Analysis-and-Industry-Forecast---ResearchAndMarkets.com#:~:text=The%20global%20fish%20oil%20market,and%20docosahexaenoic%20acids%20 (DHA).

[11]  Breivik at 28.

[12]  Bimbo, A. (2011). *Marine oils; edible oil processing*. AOCS Lipid Library, December 2016, available at https://lipidlibrary.aocs.org/edible-oil-processing/marine-





39.     Most significantly, common fish oil is ***derived using a physical, rather than a chemical process***, such that no chemical bonds are broken or created during the extraction, bleaching or deodorizing process. "Fish oil is produced without solvent extraction [but rather] is pressed out of the cooked fish."[13]

40.     The Omega-3 fatty acids found in fish oil occur naturally in triglyceride ("TAG") form. Triglyceride is the term used to define the molecular structure which bond these fatty acids (i.e., EPA and DHA) to a glycerol backbone. Triglycerides are

_____

oils. The graph represents the wet reduction process -- the most common method used to convert raw fish into fish oil.

[13] Breivik at 25.

the natural molecular form that make up virtually all fats and oils in both animals and plants and which the human body can directly digest.[14]

Depending on the type of fish from which oil was derived, and the environmental conditions in which that fish was raised, the ratio of EPA and DHA can differ slightly, but typically will account for 30% of the fatty acid content (i.e.,180 mg of EPA and 120 mg of DHA per 1000 milligrams of oil).[15]

## C.   FATTY ACID ETHYL ESTERS

41.    In the early 1980's, the Japanese pharmaceutical company Mochida developed a large-scale method to synthesize EPA and DHA into an ethyl ester chemical form. The process, known as trans-esterification, enabled scientists to increase the yield of omega-3s from 30% to upwards of 70% as well as manipulate the ratio between EPA and DHA.[16] It also allowed chemists to use fish waste, low grade and rancid fish oils as the starting material. Such source material would not be marketable for human consumption but for the trans-esterification process which eliminates rancidity and allows scientists to adjust OM3 yields.

42.    Doing so, however, required the chemical alteration of fish oil on a molecular level, substantially transforming it from a natural product, into a synthetic product known as a fatty acid ethyl ester – a substance that is not found anywhere in nature, and which has not been comparably viewed by leading health authorities.

[14] *See, e.g.,* Omega3 of Norway, available at https://norwayomega.com/omega3-fish-oil/#natural-triglycerides-vs-artificial-ethylesters (last visited April 14, 2021).

[15] NIH, *Omega-3 Fatty Acids, Fact Sheet for Health Professionals, National Institutes of Health, Office of Dietary Supplements ("NIH Fact Sheet")* available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-HealthProfessional.

[16] Klinik, M., *A Review of Omega-3 Ethyl Esters for Cardiovascular Prevention and Treatment of Increased Blood Triglyceride Levels*, Vasc Health Risk Manag (2006), doi: 10.2147/vhrm.2006.2.3.251.

**(1)**    *The Trans-Esterification Process*

43.    The first step in the trans-esterification process involves a chemical reaction whereby the glycerol backbone of each triglyceride molecule in the fish oil is broken by introduction of an industrial chemical solvent, such as sodium hydroxide, resulting in the formation of free fatty acids and a free glycerol molecule.[17] The free fatty acid forms of EPA and DHA, which are inherently unstable, are then chemically reacted with ethanol (an industrial alcohol).[18] The mixture is then heat distilled under a vacuum resulting in a condensate omega-3 ethyl ester solution. [19]  The concentration of omega-3s in the solution depends on variables within the distillation process, but typically ranges from 50-70%.[2] The constituent compounds are DHA Ethyl Esters and EPA Ethyl Esters — which are molecularly distinct from the precursor DHA and EPA triglyceride ("TAG") molecules. The diagram below shows the most common trans-

---

[17] Douglas MacKay, ND, *A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride Form* ("MacKay Publication"), http://www.promedics.ca/site/downloads/Triglycerides%20vs%20Ethyl%20Esters.pdf ; Bimbo, A, *Marin Oils*, AOCS Lipid Library, available at https://lipidlibrary.aocs.org/edible-oil-processing/marine-oils.

[18] *See* MacKay Publication; *see also Triglycerides vs. Ethyl Ester Forms of Fish Oil*, Science Based Health, https://www.sciencebasedhealth.com/Fish-Oil-EE-vs-TG-omega-3s-which-is-better-W119.aspx.

[19] Molecular distillation is a type of short-path vacuum distillation, characterized by an extremely low vacuum pressure which is performed using a molecular still. This process is characterized by short term exposure of the distillate liquid to high temperatures in high vacuum in the distillation column and a small distance between the evaporator and the condenser. https://en.wikipedia.org/wiki/Molecular_distillation; *See also* Breivik, H., H. G.G., and B. Kristinsson, *Preparation of highly purified concentrates of eicosapentaenoic acid and docosahexaenoic acid*, JAOCS, 1997. 74(11): p. 1425-29; Breivik, H. *Concentrates. In: Long Chain Omega-3 Specialty Oils*, pp. 111-140, The Oily Press Bridgwater England (2007).

esterification process beginning with crude fish oil and resulting in the formation of
ethyl esters.[20]



44.     The trans-esterification process allows manufacturers to do one of several
things that yield significant financial benefits: (1) Increase the levels of EPA-EE and
DHA-EE far in excess of the limits of TAG EPA and TAG DHA in fish oil. Where
the standard fish oil yields only 30% DHA/EPA by volume, trans-esterification allows
manufacturers to obtain DHA-EE and EPA-EE that yields upwards of 70% by
volume; (2) Alter the natural ratios of DHA/EPA (i.e., 120 mg / 180 mg per 1000 mg)
to create DHA-EE / EPA-EE in any ratio the manufacturer desires; (3) Use low grade
crude fish oil generated from fish offal -- heads, viscera and other body parts
discarded in preparing fish for consumption (i.e. fish waste) -- in lieu of a whole small
oily fish (e.g., sardine, anchovy, menhaden) that are traditionally caught and processed
for the production of fish oil. In addition to being low quality, offal produces small
volumes of oil compared to whole fish because the edible species from which they are

[20] Bimbo, A.P. *Processing of marine oils. In: Long Chain Omega-3 Specialty Oils*, pp.
77-109 (H. Breivik (ed.) The Oily Press Bridgwater England) (2007).

derived are primarily non-fatty fish.[21] For example, a study exploring the efficiency of extracting oil from the heads of two tuna species, found the crude oil yields are only between 1-2%, far less than the average 30% yield from whole fish species that are caught specifically for rendering of fish oil.[22] Inconsistent and low yields, in addition to the fact that the raw materials consist of fish waste, renders the resulting crude fish oil unsuitable for human consumption and requires trans-esterification to create a marketable product.[23]

45.     At the end of the trans-esterification process, the crude fish oil has been substantially transformed into Fatty Acid Ethyl Esters consisting of DHA-EE, EPA-EE and other OM3 fatty acid ethyl esters. At this point, the solution may be encapsulated as a dietary supplement, further concentrated into a drug or even sold as biodiesel.[24]

---

[21] Bimbo, A. (2011). Marine oils; edible oil processing. AOCS Lipid Library, December 2016, available at http://lipidlibrary.aocs.org/OilsFats/content.cfm?ItemNumber=40332

[22] Kasmiran, B. 2018.Comparison and evaluation of the quality of fish oil and fishmeal extracted from the heads of Yellowfin tuna (Thunnus albacares) and Albacore tuna (Thinnus alalunga). Nations University Fisheries Training Programme, Iceland, available at  http://www.unuftp.is/static/fellows/document/britney16prf.pdf.

[23] Alfio, V, et al, *From Fish Waste to Value: An Overview of the Sustainable Recovery of Omega-3 for Food Supplements*, Molecules. 2021 Feb; 26(4): 1002. Published online 2021 Feb 13. doi: 10.3390/molecules26041002 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7918619/

[24] *See e.g*., Lovaza Prescribing information available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021654s023lbl.pdf; Rahman, Enhanced Production of Fatty Acid Ethyl Ester with Engineered fabHDG Operon in Escherichia coli ("Biodiesel, or fatty acid ethyl ester (FAEE), is an environmentally safe, next-generation biofuel. Conventionally, FAEE is produced by the conversion of oil/fats, obtained from plants, animals, and microorganisms, by transesterification") available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6920873/#:~:text=Biodiesel%2C%20

46.     Ultimately, once trans-esterified, fish oil is substantially and irrevocably transformed into fatty acid ethyl esters -- a substance that cannot be found in any part of any fish. Therefore, simply calling it "fish oil," is deceptive, misleading and in violation of the law.

**D.      FATTY ACID ETHYL ESTERS ARE NOT FISH OIL**

**(1)    *DHA & EPA Ethyl Esters are Molecularly Distinct From DHA & EPA Found in Natural Fish Oil***

47.     The trans-esterification process substantially and irrevocably transforms the Omega-3s in fish oil from their natural triglyceride form into Omega-3 fatty acid ethyl esters. Critically, these substances, (fish oil and omega-3 fatty acid ethyl esters), are distinguishable on a molecular level such that it is impossible as a matter of law or logic for them to share a common or usual name.  Indeed, they do not. Along with their molecular differences, they have different common or usual names which must be properly represented on labeling of any dietary supplement in which they are contained. To do otherwise is deceptive, misleading, fraudulent and illegal.

---

or%20fatty%20acid%20ethyl,%2C%20and%20microorganisms%2C%20by%20transesterification.

| | DHA[25] | DHA-EE[26] |
|---|---|---|
| **Empirical Formulae** | $C_{22}H_{32}O_2$ | $C_{24}H_{36}O_2$ |
| **Molecular Weight** | 328.50 g/mol | 356.55 g/mol |
| **Synonyms** | Docosahexaenoic acid Doconexent, Cervonic acid, Doconexento Doconexentum Doxonexent Docosahexaenoate | Docosahexaenoic acid ethyl ester Ethyl docosahexaenoate Cervonic acid ethyl ester |
| **Molecular Structures** | | |



[25] See NIH, National Library of Medicine available at https://pubchem.ncbi.nlm.nih.gov/compound/445580

[26] See NIH, National Library of Medicine available at https://pubchem.ncbi.nlm.nih.gov/compound/9831416

| | **EPA**[27] | **EPA-EE**[28] |
|---|---|---|
| **Empirical Formulae** | $C_{20}H_{30}O_2$ | $C_{22}H_{34}O_2$ |
| **Molecular Weight** | 302.5 g/mol | 330.51 |
| **Synonyms** | Eicosapentaenoic acid<br>Icosapent, 10417-94-4<br>Icosapento<br>Icosapentum<br>Timnodonic acid | Eicosapentaenoic acid ethyl ester<br>Epadel<br>Ethyl eicosapentaenoate<br>Ethyl eicosapentaenoic acid<br>Ethyl icosapentaenoate<br>Ethyl icosapentate<br>Ethyl-eicosapentaenoic acid<br>Ethyl-EPA<br>Icosapentaenoate<br>icosapentate<br>Icosapent ethyl<br>Timnodonic acid ethyl ester |
| **Molecular Structures** | | |



[27] Pub Chem, available at https://pubchem.ncbi.nlm.nih.gov/compound/446284

[28] Pub Chem, available at https://pubchem.ncbi.nlm.nih.gov/compound/9831415

1   48.   As demonstrated above, these molecules are distinct in every regard.

2   They have different molecular weights, chemical structures, physical properties and

3   common/usual names.

4   **(2)   Monographs**

5   49.   The United States Pharmacopeia ("USP") is one of the most

6   comprehensive sources for medicine and dietary supplement standards in the world.

7   The USP National Formulary ("USP-NF") provides over 5000 reference standards for

8   medicines and over 300 reference standards for dietary supplements. The standards

9   are used to help ensure the quality of these products and their ingredients, and to

10   protect the safety of patients.[29]

11   50.   Among its quality standards, the USP-NF provides a series of

12   monographs which articulate the quality expectations for "identity, strength, purity,

13   and performance" of certain drugs and dietary supplements. *Id*. Included among the

14   USP references for dietary substances are monographs for Docosahexaenoic Acid

15   Ethyl Ester (500 mg); Docosahexaenoic Acid (250 mg); Eicosapentaenoic Acid (300

16   mg); Eicosapentaenoic Acid Ethyl Ester; Fish Oil Omega-3 Acid Ethyl Esters

17   Concentrate; Omega-3-Acid Ethyl Esters; and Fish Oil (1 g).

18   51.   Figure A below juxtaposes the mass spectra of the USP monograph for

19   fish oil with that of Walmart's Product.[30] As demonstrated below, fish oil is an

20   amazingly complex natural product which consists of hundreds of constituent

21   ingredients. In contrast, the Walmart's Product is a synthetic construct consisting

22   primarily of DHA-EE and EPA-EE. Each peak represents a different molecule with a

23

24   [29] https://www.usp.org/about/public-policy/overview-of-monographs

25   [30] United States Pharmacopeia – National Formulary Catalog # 1270424, available at

26   https://store.usp.org/OA_HTML/ibeCCtpItmDspRte.jsp?sitex=10020:22372:US&item

27   =33515

28

unique mass to charge ratio (m/z). From a macro perspective, the monographs undeniably demonstrate that these are distinct products. From a granular perspective, the monographs highlight the fact that, despite their representation to the contrary, Walmart's Product contains no DHA or EPA, much less in the amounts claimed.



Figure A: Comparison of USP Fish Oil standard with Walmart's Product.

52.     In addition to the USP, numerous other industry and scientific authorities independently confirm the differences between fish oil and Omega-3 fatty acid ethyl esters.

53.     Codex Alimentarius Commission ("Codex") was created in 1963 by two U.N. organizations, the Food and Agriculture Organization and the World Health Organization. Its main purpose is to protect the health of consumers and to ensure fair practices in international trade in food through the development of food standards, codes of practice, guidelines and other recommendations. Codex standards and guidelines are developed by committees, which are open to all member countries. Member countries review and provide comments on Codex standards and related texts at several stages in the development process. In the United States, public meetings are held to receive comments on Codex drafts and comments are invited from all interested parties. Although Codex standards and related texts are voluntary, they do provide a template for laws and are used by the World Trade Organization as an agreed benchmark in global trade disputes.[31]

54.     FDA participates and exercises leadership in the Codex Alimentarius Commission. The objective of FDA's participation in Codex is to develop science-based international food safety, labeling, and other pertinent standards that provide consumer protection, labeling information, and prevention of economic fraud and deception that are consistent with U.S. regulations and laws.

55.     FDA uses procedures that promote consumer protection and transparency, as it works with the U.S. Codex Office to develop U.S. Delegation positions on matters before relevant Codex committees.[32]

---

[31] FDA, *Responses to Questions about Codex and Dietary Supplements*, available https://www.fda.gov/food/dietary-supplements-guidance-documents-regulatory-information/responses-questions-about-codex-and-dietary-supplements#what (last visited April 13, 2021).

[32] FDA, *FDA's Participation in Codex*, available at https://www.fda.gov/food/international-cooperation-food-safety/fdas-participation-codex (last visited April 13, 2021).

56.     In 2017, the Codex Alimentarius Committee adopted standards for fish oil. It was a long process that started in 2011 "involving many discussions on the finer details which was important to clarify as the purpose of this Standard is to protect consumer health and promote fair practices in the trade of fish oil."[33]  Significantly, the Codex, like the USP, recognizes and draws a distinction between natural fish oil and trans-esterified products.[34]

57.     Similarly, the Global Organization for EPA and DHA omega-3s ("GOED"), the largest and most significant trade group of the Omega-3 industry, also maintains a series of monographs which, like the USP and CODEX, differentiate between triglycerides, ethyl esters and re-esterified triglyceride Omega-3s as well a series of particular fish oils (e.g., Salmon, Tuna, Anchovy, etc). It provides members "technical guidance on specific and recommended test methodologies and quality parameters for a number of EPA and/or DHA containing product classes currently covered under the GOED Voluntary Monograph."[35] EPA/DHA-containing product classes currently covered by this GOED Voluntary Monograph [include]: Refined EPA and/or DHA Omega-3 Oil Triglycerides, EPA and/or DHA Omega-3 Oil Ethyl Ester Concentrates, EPA and/or DHA Omega-3 Oil Triglyceride Concentrates, Tuna

---

[33] IFFO, *CODEX Standard for Fish Oil*, available at https://www.iffo.net/codex-standard-fish-oil (last visited April 13, 2021).

[34] Section 2.2 defines "Fish oils" as those derived from one or more species of fish or shellfish.[34] In contrast, Section 2.6 defines "Concentrated fish oils ethyl esters" as those derived from fish oils described in Section 2.1 to 2.4 and are primarily composed of fatty acids ethyl esters. See, *Report of the U.S. Delegate, 25th Session, Codex Committee on Fats and Oils, United States Department of Agriculture*, available at https://www.usda.gov/sites/default/files/documents/delegates-report-02272017.pdf (last visited April 13, 2021).

[35] GOED Voluntary Monograph, Version 7.2, March 15, 2021 , available at https://goedomega3.com/goed-monograph (last visited April 13, 2021).

Oil, Salmon Oil and Anchovy Oil. Consistent with the USP and Codex, GOED's monographs confirm that fish oil is not synonymous with fatty acid ethyl esters and cannot be so named.

### (3)   U.S. Customs and Border Protection

58.    The U.S. Customs and Border Protection ("CBP") is one of the world's largest law enforcement organizations whose duties include the facilitation of lawful international trade.[36] Among other things, the CPB is responsible for the interpretation and enforcement of the Harmonized Tariff Schedule of the United States ("HTS") which is a hierarchical structure for describing all goods in trade for duty, quota, and statistical purposes.[37]

59.    The CPB has issued more than 20,000 rulings related to the proper interpretation of products and where they may be classified under the HTS.

60.    On several occasions the CPB considered the appropriate tariff classification for Omega-3 Acid Ethyl Esters. Consistently, the CPB recognized that trans-esterification *substantially transforms* fish oil into a different product which results in a different tariff classification.

61.    In 2011, the CPB tested and reviewed a product that was described as "a gelatin capsule containing 1000 milligrams of fish oil, said to be derived from anchovy, sardine, herring or other fish species." The CPB determined that the "fish oil" had been substantially transformed from its original fish oil source -- "the crude fish oil has been refined and chemically modified by deodorizing, ethylating (conversion of triglycerides to ethyl esters), distillation, winterizing/cold filtrating,

---

[36] See, U.S. Customs and Border Protection available at https://www.cbp.gov/about (last visited April 13, 2021).

[37] United States International Trade Commission, available at https://www.usitc.gov/harmonized_tariff_information (last visited April 13, 2021).

bleaching and drumming." Accordingly, while the petitioner sought to classify the trans esterified product under Section 1504.20.4000 of the HTS which pertains to "fish-liver oils and their fractions, whether or not refined, ***but not chemically modified***," the CPB concluded that "[b]ased on the manufacturing process of the fish oil, they will be classified elsewhere…. The applicable subheading for these products will be 2106.90.9998, HTSUS, which provides for food preparations not elsewhere specified or included…other…other…other. The duty rate will be 6.4 percent ad valorem." (emphasis added).[38]

62.     Just as an apple cannot be called a pear, an omega-3 acid ethyl ester cannot be called fish oil. Walmart is obligated by law to label its Products truthfully and accurately. At bottom, this Product is nothing more than a fatty acid ethyl ester. Labeling and selling it as fish oil is false, misleading, deceptive and unlawful.

## FEDERAL AND STATE LAW

63.     The Federal Food, Drug & Cosmetic Act ("FDCA") broadly regulates the sale of food and beverages to the consuming public. 21 U.S.C §301. It was

---

[38] Customs Ruling, N171795, July 5, 2011, available at https://rulings.cbp.gov/search?term=N171795&collection=ALL&sortBy=RELEVANCE&pageSize=30&page=1; *See also,* HQ H295287 (June 18, 2020) available at https://rulings.cbp.gov/search?term=HQ%20H295287&collection=ALL&sortBy=RELEVANCE&pageSize=30&page=1 ("CBP has a long-standing position that in order to be classified in Chapter 15, HTSUS, as fats or oils, products must predominantly be composed of triglycerides. See Headquarters Ruling Letter ("HQ") H102457, dated September 8, 2010; HQ 963166, dated December 11, 2001; HQ 965396, dated July 23, 2002; HQ 964531, dated March 14, 2002; HQ 965699, dated September 25, 2002; New York Ruling Letter ("NY") N234974, dated November 19, 2012…. Accordingly, only products composed primarily of triglycerides are classifiable under heading 1515, HTSUS."); *See, also,* United States Pharmacopeia – National Formulary monograph catalog confirming different HTSUS as between fish oil and Omega-3 Fatty Acids.

promulgated in significant part to prevent consumer deception and was principally implemented through the creation of a uniform system of labeling on which consumers could rely to make informed purchasing decisions.

64.     The FDCA prohibits the misbranding of any food. 21 U.S.C. §331(b). Generally, a food is misbranded if, among other things, its labeling is false or misleading.  21 U.S.C. § 343.

65.     The Nutrition Labeling and Education Act of 1990 amended the FDCA by requiring that most foods, including dietary supplements, bear nutrition labeling. Subsequently, the Dietary Supplement Health and Education Act of 1994 ("DSHEA") amended the Act, in part, by defining "dietary supplements," adding specific labeling requirements for dietary supplements, and providing for optional labeling statements.

66.     Dietary supplements must bear labeling in accordance with applicable provisions of FDCA. Walmart Product labels not only violate the clear mandates of the FDCA, but are independently false, misleading, and operate as a deception on the consuming public.[39]

### **(1)**   *Fish Oil is not the Common or Usual Name of the Product*

67.     The principal display panel ("PDP") of the Walmart Product describes the supplement as "Fish Oil" containing 1000 mg of EPA/DHA Omega-3s.

**Section 21 C.F.R. 101.3**  states in relevant part:

---

[39] Identical federal and California laws regulate the content of labels on packaged food and drink. The requirements of the FDCA, and its labeling regulations, including those set forth in 21 C.F.R. §§ 101, 102, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state").

(a) The principal display panel of a food in package form shall bear as one of its principal features a statement of the identity of the commodity. (b) Such statement of identity shall be in terms of: (1) The name now or hereafter specified in or required by any applicable Federal law or regulation; or, in the absence thereof, (2) The common or usual name of the food; or, in the absence thereof (3) An appropriately descriptive term, or when the nature of the food is obvious, a fanciful name commonly used by the public for such food.

68.     The statement of identity for a dietary supplement is the name that appears on the label of the dietary supplement. As a general matter, the statement of identity of a dietary supplement is the name specified by federal law or regulation, or, if no such name is specified, its common or usual name.  If the dietary supplement has no common or usual name and its nature is not obvious, the statement of identity must be an appropriately descriptive term.[40]

69.     As demonstrated in great detail herein, Fish Oil and Omega-3 Acid Ethyl Esters are not the same. They are different on a molecular level and have different common and usual names.

70.     Walmart's misrepresentation is not only emblazoned on the Product's Principal Display Panel, but is repeated on the Products' Supplement Facts Panel.

71.     It is indisputable that Walmart's Products were trans-esterified – a process that substantially transformed oil derived from fish waste into a synthetic product consisting of fatty acid ethyl esters.

72.     Consumers wishing to ingest Omega-3s have numerous choices including those relevant here -- a natural marine source versus one that is chemically synthesized.  Each product is molecularly different and has an array of qualities that

---

[40] See, 21 U.S.C. 321(ff)(2)(C), 21 U.S.C. 343(s)(2)(B), 21 CFR §101.1 and 21 CFR §101.3; FDA Dietary Supplement Labeling Guide "FDA Labeling Guide") available at https://www.fda.gov/food/dietary-supplements-guidance-documents-regulatory-information/dietary-supplement-labeling-guide-chapter-ii-identity-statement.

differ from one another. Among them: (1) Bioavailability (i.e., the degree and rate at which substances are absorbed into a living system). Several studies found that the optimal absorption of an ethyl ester formulation requires it to be taken with a high-fat meal – a dietary choice that many consumers, especially those generally concerned about heart-health, would likely try to avoid.[41]; (2) Presence of ethanol. The ethanol introduced in order to create EE-OM3 ethyl esters must be filtered through the liver where it is drawn off before the body converts the resulting free fatty acids back into triglyceride form. Even though the quantity of ethanol released in a typical dose of an Omega-3 supplement is small, at-risk groups such as alcoholics, pregnant women and young children should refrain from using fatty acid supplements that contain ethyl esters;[42] (3) Stability: Omega-3s in ethyl ester form are much less stable than those in their natural triglyceride form and more readily oxidize;[43] and (4) the fact that fish oil is a natural substance and the ethyl ester is chemically synthesized from fish waste and rancid low grade oil.

---

[41] *See, e.g.*, L. Chevalier, et al, Comparison of Pharmacokinetics of Omega-3 Fatty Acid Supplements in Monoacylglycerol or Ethyl Ester In Humans: A Randomized Controlled Trial, European Journal of Clinical Nutrition (2020)(omega-3 fatty acids supplements on the market are esterified in triglycerides (TG) or ethyl ester (EE); the latter is absorbed less than other esterification forms); J.F. Lapointe, et al, *A Single-dose, Comparative Bioavailability Study of a Formulation containing OM3 as Phospholipid and Free Fatty Acid to an Ethyl Ester Formulation in the Fasting and Fed States*, Clinical Therapeutics/Volume 41, Number 3, 2019 (Results demonstrate that the bioavailabilities of EPA and DHA with Omega-3 Free fatty Acid are far less affected by the fat content of a meal as compared to the EPA and DHA ethyl esters in Omega-3 ethyl ester).

[42] https://www.filomedica.com.cy/wp-content/uploads/2015/02/Fish-Oil-Triglycerides-vs.pdf.

[43] Mackay, A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride Form, available from http://www.promedics.ca/site/downloads/Triglycerides%20vs%20Ethyl%20Esters.pdf.

73.     These qualities further differentiate the products in the marketplace and are material to consumers' purchasing decisions. Walmart's failure to identify their Products by their common and usual name, obfuscated the most important information that is conveyed about a product – its name and contents.  By failing to properly name its Products, Walmart has deceived Plaintiff and members of the class, depriving them of a consumer's most basic right – to make an informed purchasing decision.

**(2)**     *The Product Does not contain EPA or DHA*

74.     21 C.F.R. §101.4(a) requires all ingredients on the dietary supplement label to also be declared by their common or usual name.  Moreover, the name shall be a "specific name and not a (generic) collective name…" 21 C.F.R. §101.4(b). Dietary ingredients for which FDA has not established a recommended daily intake (e.g., EPA and DHA in any form) "shall be declared by their common or usual name when they are present in a dietary supplement." 21 C.F.R. §101.36(b)(3).

75.     Walmart's misrepresentation regarding the Product's statement of identity, which appears on both the PDP and SFP, is bolstered by the similarly deceptive representation that the Product contains EPA and DHA which is made in two separate places on the Product label – once in bold red letters on the PDP and again in the SFP.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



20   76.   On the PDP it is simply stated as EPA and DHA. It does not properly list

21   the OM3 content as EPA-EE and DHA-EE. On the SFP, it is again listed as EPA and

22   DHA along with the scientific names for each. The actual ingredient, however, is

23   EPA-EE and DHA-EE both of which have distinct scientific names which Walmart

24   does not use.  More misleadingly, however, Walmart refers to the OM3 content as

25   both Triglycerides and as "EE."  Although Walmart fails to define the acronym "EE,"

26   leaving a consumer to guess at its meaning, assuming arguendo that EE means ethyl

27
28

1   ester, it is impossible to be both a triglyceride and ethyl ester, rendering an already

2   deceptive label even more false and misleading.[44]

3                          **(3)**   *The Label incorrectly represents the Amount of*

4   *Omega-3 in the Product*

5       77.   The SFP states that the Product contains "1,000 mg of Fish Oil"

6   consisting of "1,060 mg of Fatty Acids." As a preliminary matter, mathematically, it is

7   impossible for a 1,000 mg capsule to contain 1,060 mg of anything. Secondly, and

8   more critically, as demonstrated above, each capsule contains only half of the

9   promised Omega-3s, 200 mg DHA-EE and 300 mg EPA-EE rendering the claim that

10  it contains 600 mg of EPA and 400 mg of EPA false and misleading. Not only is the

11  Omega-3 offered by the Product not in natural triglyceride form, but it's also less than

12  half of the Omega-3 promised on both the front and back of the label, denying

13  consumers the right amount of the most fundamental ingredient of the Product.

14                         **(4)**   *Walmart Fails to List All the Ingredients in the*

15  *Products*

16      78.   While the Product principally contains EPA-EE and DHA-EE,  it also

17  contains other omega-3s which Walmart fails to identify and list in the Supplement

18  Fact Panel in contravention of its obligations under the FDCA.

19      79.   Section 21 C.F.R. §101.36 applies specifically to the nutrition labeling of

20  dietary supplements. It divides dietary ingredients into two categories – those that

21  have a Reference Daily Intake (RDI) or a Daily Reference Value (DRV) as

22  established in §101.9(c) (referred to as "(b)(2)-dietary ingredients") and those that do

23  not have an RDI/DRV (referred as "other ingredients"). 21 CFR §§101.36(b)(2) and

24  (3).

25

26

---

27  [44] The mass spectra (supra) conclusively demonstrate this product is an ethyl ester and

28  is entirely devoid of triglycerides,

80.     Dietary ingredients for which no daily values have been established must be listed by their common or usual names when they are present in a dietary supplement. They must be identified as having no Daily Values by use of a symbol in the column for % Daily Value that refers to the footnote Daily Value Not Established. 21 CFR 101.36(b)(2)(iii)(F) and (b)(3).

81.     OM3s, in any form, do not have an RDI/DVR and therefore are considered other dietary ingredients. Their constituent components must be listed pursuant to 21 C.F.R. §101.36(b)(3). In addition to EPA-EE and DHA-EE, the Product contains additional OM3 ethyl esters` which are not listed.

82.     Walmart's failure to include these sub-components in the Supplement Fact Section further deprives consumers of material information relevant to making informed purchasing decisions. Failure to include this information operates as a fraud and deception on the consuming public and is violation of the law.

## ECONOMIC INJURY

83.    Plaintiff sought to buy Products that were lawfully labeled, marketed and sold.

84.    Plaintiff saw and relied on Defendant's misleading labeling of its Products.

85.    Plaintiff believed that the Product purchased contained real fish oil.

86.    Plaintiff believed that the Product was lawfully marketed and sold.

87.    In reliance on the claims made by Defendants regarding the qualities of their Product, Plaintiff paid for a Product which he did not receive and/or paid a price premium.

88.    As a result of his reliance on Defendant's misrepresentations, Plaintiff received a Product that lacked the promised ingredient which he reasonably believed it contained.

89.    Plaintiff received a Product that was unlawfully marketed and sold.

90.    Plaintiff lost money and thereby suffered injury as he would not have purchased this Product and/or paid as much for it absent the misrepresentation.

91.    Defendant knows that the statement of identity and contents of a dietary supplement are material to a consumer's purchasing decision.

92.    Plaintiff altered his position to her detriment and suffered damages in an amount equal to the amounts he paid for the Product, and/or in additional amounts attributable to the deception.

93.    By engaging in the false and deceptive conduct alleged herein Defendant reaped, and continues to reap financial benefits in the form of sales and profits from its Product.

94.    Plaintiff would be willing to purchase Walmart Products again in the future should he be able to rely on Defendant's labeling and marketing as truthful and non-deceptive.

## **CLASS ACTION ALLEGATIONS**

95.     Plaintiff brings this action on behalf of himself and on behalf of classes of all others similarly situated consumers defined as follows:

        a.  **National**: All persons in the United States who purchased Class Products in the United States during the Class Period.

        b.  **California:** All persons in California who purchased the Class Products in California during the Class Period.

        c.  **Class Period** is the maximum time allowable as determined by the statute of limitation periods accompanying each cause of action.

96.     Plaintiff brings this Class pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3) and 23(c)(4).

97.     Excluded from the Classes are: (i) Defendant and its employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned.

98.     Upon information and belief, there are tens of thousands of members of the Class. Therefore, individual joinder of all members of the Class would be impracticable.

99.     There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

100.    Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include but are not limited to:

        a.  Whether Defendant marketed, packaged, or sold the Class Products to Plaintiff and those similarly situated using false, misleading, or deceptive statements or representations;

        b.  Whether Defendant omitted or misrepresented material facts in connection with the sales of their Products;

        c.   Whether Defendant participated in and pursued the common

course of conduct complained of herein;

d.  Whether Defendant has been unjustly enriched as a result of their unlawful business practices;

e.  Whether Defendant's actions violate the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq*. (the "UCL");

f.  Whether Defendant's actions violate the False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq*. (the "FAL");

g.  Whether Defendant's actions violate the Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq*. (the "CLRA");

h.  Whether Defendant's actions constitute breach of express warranty;

i.  Whether Defendant should be enjoined from continuing the above-described practices;

j.  Whether Plaintiff and members of the Class are entitled to declaratory relief; and

k.  Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices.

101.  Plaintiff's claims are typical of the claims of the Class, in that Plaintiff was a consumer who purchased Defendant's Product. Plaintiff is no different in any relevant respect from any other Class member who purchased the Product, and the relief sought is common to the Class.

102.  Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent, and he has retained counsel competent and experienced in conducting complex class action litigation. Plaintiff and his counsel will adequately protect the interests of the Class.

103.   A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member likely will be relatively small, especially given the cost of the Products at issue and the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's conduct. Thus, it would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Moreover, even if members of the Class could afford individual actions, it would still not be preferable to class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

104.   In the alternative, the Class may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final equitable relief with respect to each Class.

105.   The requirements for maintaining a class action pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## **CAUSES OF ACTION**

106.   Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### FIRST CAUSE OF ACTION

**Unlawful Business Practices**
**Violation of The Unfair Competition Law ("UCL")**
**Bus. & Prof. Code §§17200, *et seq*.**

107.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

108.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

109.   A business act or practice is "unlawful" if it violates any established state or federal law.

110.   Defendant's acts, omissions, misrepresentations, practices, and/or non-disclosures concerning the Products alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§301, et seq. and its implementing regulations, including, at least, the following sections:

   a.   21 U.S.C. §343(a), which deems food misbranded when its labeling contains a statement that is false or misleading in any particular;

   b.   21 C.F.R. §102.5(a)-(d), which prohibits the naming of foods so as to create an erroneous impression about the presence or absence of ingredient(s) or component(s) therein;

   c.   21 U.S.C. §§331and 333, which prohibits the introduction of misbranded foods into interstate commerce.

   d.   21 C.F.R. §101.3 and 21 C.F.R. §101.36 as described above, pertaining to, *inter alia,* use of common or usual names.

111.   California has expressly adopted federal labeling requirements as its own pursuant to the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §

109875 et seq. (the "Sherman Law"), the Sherman Law, which provides that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state." Cal. Health & Safety Code § 110100.

112.   Each of Walmart's violations of federal law and regulations violates California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. (the "Sherman Law"), including, but not limited to, the following sections:

113.   Section 110100 (adopting all FDA regulations as state regulations);

114.   Section 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account.");

115.   Section 110390 ("It is unlawful for any person to disseminate any false advertisement of any food. . . .  An advertisement is false if it is false or misleading in any particular.");

116.   Section 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised.");

117.   Section 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded.");

118.   Section 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . ."); and

119.   Section 110660 ("Any food is misbranded if its labeling is false or misleading in any particular.").

120.   Each of the challenged omissions, statements, and actions by Walmart violates the FDCA, and the Sherman Law, and, consequently, violates the "unlawful" prong of the UCL.

121. Walmart's conduct is further "unlawful" because it violates California's False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq. (the "FAL"), and California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq. (the "CLRA"), as discussed in the claims below.

122. By committing the unlawful acts and practices alleged above, Defendant has engaged, and continue to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§17200, *et seq.*

123. Through its unlawful acts and practices, Defendant has obtained, and continues to unfairly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and all members of the Class, to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an order is not granted.

## SECOND CAUSE OF ACTION
### Unfair Business Practices
### Violation of The Unfair Competition Law
### Bus. & Prof. Code §§ 17200, *et seq.*

124. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

125. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

126. A business act or practice is "unfair" under the Unfair Competition Law if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

127. Defendant has violated, and continue to violate, the "unfair" prong of the UCL through their misleading description of the Products. The gravity of the harm to

members of the Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications, or motives of Defendant for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendant engaged, and continued to engage, in unfair business practices within the meaning of California Business and Professions Code §§17200, *et seq*.

128. Through their unfair acts and practices, Defendant obtained, and continued to unfairly obtain, money from members of the Class. As such, Plaintiff has been injured and requests that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, to disgorge the profits Defendants made on their Products, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

### THIRD CAUSE OF ACTION
**Fraudulent Business Practices**
**Violation of The Unfair Competition Law**
**Bus. & Prof. Code §§ 17200, *et seq*.**

129. Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

130. The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

131. A business act or practice is "fraudulent" under the Unfair Competition Law if it actually deceives or is likely to deceive members of the consuming public.

132. Defendant's acts and practices of mislabeling their Products in a manner to suggest they principally contained their characterizing ingredients.

133. As a result of the conduct described above, Defendants have been, and will continue to be, unjustly enriched at the expense of Plaintiff and members of the proposed Class. Specifically, Defendant has been unjustly enriched by the profits they have obtained from Plaintiff and the Class from the purchases of their Products.

134.   Through their fraudulent acts and practices, Defendant has improperly obtained, and continue to improperly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and the Class, to disgorge the profits Defendant has made, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

## FOURTH CAUSE OF ACTION
**False Advertising**
**Violation of California Business & Professions Code §§ l7500, *et seq.***

135.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

136.   Defendant uses advertising and packaging to sell its Products. Defendant disseminates advertising regarding its Products which by their very nature are deceptive, untrue, or misleading within the meaning of California Business & Professions Code §§17500, *et seq.* because those advertising statements contained on the labels are misleading and likely to deceive, and continue to deceive, members of the putative Class and the general public.

137.   In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of California Business & Professions Code §§17500, *et seq.*

138.   The misrepresentations and non-disclosures by Defendant of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code §§17500, *et seq.*

139.   Through their deceptive acts and practices, Defendant has improperly and illegally obtained money from Plaintiff and the members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and

the members of the Class, and to enjoin Defendant from continuing to violate California Business & Professions Code §§17500, *et seq.*, as discussed above. Otherwise, Plaintiff and those similarly situated will continue to be harmed by Defendant's false and/or misleading advertising.

140.   Pursuant to California Business & Professions Code §17535, Plaintiff seeks an Order of this Court ordering Defendants to fully disclose the true nature of their misrepresentations. Plaintiff additionally requests an Order: (1) requiring Defendant to disgorge its ill-gotten gains, (2) award full restitution of all monies wrongfully acquired by Defendants and (3), interest and attorneys' fees. Plaintiff and the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

## FIFTH CAUSE OF ACTION
### Violation of the Consumers Legal Remedies Act
### California Civil Code §§ 1750, *et seq.*

141.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

142.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq.* (the "CLRA").

143.   Plaintiff and each member of the proposed Class are "consumers" within the meaning of Civil Code §1761(d).

144.   The purchases of the Products by consumers constitute "transactions" within the meaning of Civil Code §1761(e) and the Products constitute "goods" within the meaning of Civil Code §1761(a).

145.   Defendant has violated, and continue to violate, the CLRA in at least the following respects:

a. §1770(5) pertaining to misrepresentations regarding the characteristics of goods sold—specifying that misleading representations regarding ingredients violate the CLRA;

b. §1770(7) pertaining to misrepresentations regarding the standard, quality, or grade of goods sold; and

c. § 1770(9) pertaining to goods advertised with the intent not to provide what is advertised.

146.   Defendant knew, or should have known, that the labeling of their Products violated consumer protection laws, and that these statements would be relied upon by Plaintiff and the members of the Class.

147.   The representations were made to Plaintiff and all members of the Class. Plaintiff relied on the accuracy of the representations on Defendants' labels which formed a material basis for his decision to purchase the Products. Moreover, based on the very materiality of Defendant's misrepresentations uniformly made on or omitted from their Product labels, reliance may be presumed or inferred for all members of the Class.

148.   Defendant carried out the scheme set forth in this Complaint willfully, wantonly, and with reckless disregard for the interests of Plaintiff and the Class, and as a result, Plaintiff and the Class have suffered an ascertainable loss of money or property.

149.   Plaintiff and the members of the Class request that this Court enjoin Defendants from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above, pursuant to California Civil Code §1780(a)(2). Unless Defendant is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers of Defendant's Products will be damaged by their acts and practices in the same way as have Plaintiff and the members of the proposed Class.

150.   Plaintiff served a CLRA demand pursuant to Civil Code §1782, notifying Defendant of the conduct described herein and that such conduct was in violation of

particular provisions of Civil Code §1770. Defendant has refused to provide a proper remedy absent a proper remedy, thereby making ripe Plaintiff's claim for damages, which he now seeks pursuant to Civil Code § 1780(a).

## SIXTHCAUSE OF ACTION
### Violation of Breach of Express Warranty

151.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if restated herein.

152.   Plaintiffs' express warranty claims are based on violations of Cal. Com. Code §2313. Defendant was afforded reasonable notice of this claim in advance of the filing of this complaint.

153.   Defendant made express warranties to Plaintiff and members of the Class that the Products they purchased consisted of real fish oil in its natural triglyceride form; that its principal constituent components were DHA and EPA (as opposed to DHA-EE and EPA-EE); and that the Product contained DHA/EPA in specified amounts.

154.   The express warranties made to Plaintiff and members of the Class appear on every Product label. This warranty regarding the nature of the Product marketed by Defendant specifically relates to the goods being purchased and became the basis of the bargain.

155.   Plaintiff and Class members purchased the Products in the belief that they conformed to the express warranties that were made on the Products' labels.

156.   Defendant breached the express warranties made to Plaintiff and members of the Class by failing to supply goods that conformed to the warranties it made. As a result, Plaintiff and members of the Class suffered injury and deserve to be compensated for the damages they suffered.

157.   Plaintiff and the members of the Class paid money for the Products. However, Plaintiff and the members of the Class did not obtain the full value of the

advertised Products. If Plaintiff and other members of the Class had known of the true nature of the Product, they would not have purchased them or paid less for them. Accordingly, Plaintiff and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

158.   Plaintiff and Class members are therefore entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

### SEVENTH CAUSE OF ACTION
**Restitution Based On Quasi-Contract/Unjust Enrichment**

159.   Plaintiff incorporates each and every allegation contained in the paragraphs above as if rewritten herein.

160.   Defendant's conduct in enticing Plaintiff and the Class to purchase its Products with false and misleading packaging is unlawful because the statements contained on the Defendant's Product labels are untrue.

161.   Defendant took monies from Plaintiff and the Class for these Products and have been unjustly enriched at the expense of Plaintiff and the Class as result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Defendant to restore these ill-gotten gains to Plaintiff and the Class.  It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiff and Class members.

162.   As a direct and proximate result of Defendant's unjust enrichment, Plaintiff and the Class are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

THEREFORE, Plaintiff, on behalf of himself and on behalf of the other members of the Class and for the Counts so applicable on behalf of the general public request an award and relief as follows:

A.    An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed Class Representative, and Plaintiff's counsel be appointed Lead Counsel for the Class.

B.    Restitution in such amount that Plaintiff and all members of the Class paid to purchase Defendant's Product or restitutionary disgorgement of the profits Defendant obtained from those transactions, for Causes of Action for which they are available.

C.    Compensatory damages for Causes of Action for which they are available.

D.    Statutory penalties for Causes of Action for which they are available.

E.    Punitive Damages for Causes of Action for which they are available.

F.    A declaration and Order enjoining Defendant from marketing and labeling their Products deceptively, in violation of laws and regulations as specified in this Complaint.

G.    An Order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and pre and post judgment interest.

H.    An Order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein.

I.    Such other and further relief as may be deemed necessary or appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all causes of action or issues so triable.


DATED: June 21, 2022                    Respectfully submitted,


Michael D. Braun
**KUZYK LAW, LLP**
1999 Avenue of the Stars, Ste. 1100
Los Angeles, California 90067
Telephone:   (213) 401-4100
Facsimile:    (213) 401-0311
Email:  mdb@kuzykclassactions.com


*Counsel for Plaintiff*

### CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)

I, Michael D. Braun, declare as follows:

I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am an attorney at Kuzyk Law. LLP, counsel of record for Plaintiff Edison Corpuz. Plaintiff Corpuz resides in Oceanside, California. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Southern District of California, as Plaintiff purchased the Products from brick-and-mortar retails stores located within this District. Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiff from this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed in Los Angeles, California on June 21, 2022.

Michael D. Braun

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF